UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
CENTRAL DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | * | CR 10-30033-RAL |
| Plaintiff, | * | |
| vs. | * | OPINION AND ORDER |
| | * | GRANTING IN PART AND |
| JUSTIN LINDER, | * | DENYING IN PART |
| | * | DEFENDANT'S MOTION |
| Defendant. | * | TO SUPPRESS EVIDENCE |

**I. INTRODUCTION**

This matter is before the Court on the Report and Recommendation (Doc. 28) issued by Magistrate Judge Mark A. Moreno, which recommends that this Court grant in part and deny in part Defendant Justin Linder's motion to suppress evidence. (Doc. 14). Linder filed a statement of objections (Doc. 34) to the findings and factual determinations made in the Report and Recommendation, as allowed by 28 U.S.C. § 636(b)(1).

In considering a magistrate judge's recommendation on a dispositive matter, such as a motion to suppress evidence, a district court must make a "de novo determination of those portions of the report or . . . recommendations to which objection is made." 28 U.S.C. § 636(b)(1). A de novo review requires a district court to make its own determination of disputed issues. See United States v. Portmann, 207 F.3d 1032, 1033 (8th Cir. 2000).

Linder objects to the factual findings of Magistrate Judge Moreno. When a defendant objects to the factual findings of the magistrate judge, the district court must make its own de novo determination of the facts with no deference to the magistrate judge's findings. See 28 U.S.C. § 636(b)(1). In order to make a proper de novo review of a magistrate judge's report of

1

factual findings, the district court must make an independent review of the record, including tapes of evidence and the transcript of evidentiary hearings before the magistrate judge. See Portmann, 207 F.3d at 1033. This Court has conducted a de novo review of the record, including the transcripts of the evidentiary hearing on Linder's motion to suppress the statement (Doc. 62).

## II. FACTS

On November 28, 2009, South Dakota Highway Trooper Michael Peterson pulled Linder over for speeding on South Dakota Highway 45. (T. 17-18).[1] After stopping Linder, Trooper Peterson brought Linder back to the patrol car to issue Linder a citation for driving 80 miles per hour in a 65 miles per hour zone. (T. 18). While seated next to Linder in the patrol car, Trooper Peterson detected the odor of burnt marijuana emanating from Linder and asked Linder if anyone in his vehicle had been smoking marijuana.[2] (T. 19). Linder denied that anyone in his car had been smoking marijuana, to which Trooper Peterson responded that someone had been because Trooper Peterson could smell it. (Ex. 2 at 14:50). During this exchange, Trooper Peterson told Linder that he was not saying that Linder had marijuana, but that someone had been smoking it. (Id. at 14:50). Linder responded that he understood and that no one in his vehicle had been smoking marijuana. Id. While completing Linder's speeding citation, Trooper Peterson again asserted that someone must have been smoking marijuana in Linder's car, and that they would have to figure something out because Trooper Peterson was "not going to drop it." (Id. at 14:51).

---

[1] All citations to the Motion to Suppress Hearing Transcript use a "T" followed by the page number.

[2] At the Motion to Suppress Hearing, Trooper Peterson testified that he did not smell the odor of burnt or raw marijuana coming from inside Linder's car. (T. 30). Rather, Trooper Peterson only smelled burnt marijuana when he was seated next to Linder in the patrol car. (T. 30).

2

Linder persisted in his denial. (Id. at 14:51-55).

After asking Linder for his height and weight so as to complete the speeding citation, Trooper Peterson told Linder that "I am not going to yell at you about it, but I am not going to drop it ok? I know that somebody smoked in there and I am going to search your vehicle and if I find anything . . ." (Id. at 14:52).[3] A few minutes after telling Linder this, Trooper Peterson told Linder that he had given Linder a chance to think about what he wanted to say and again asked Linder why he smelled like burnt marijuana. (Id. at 14:54). Linder then admitted that his cousin had been smoking marijuana in his car, but stated that there was no longer any marijuana in the vehicle as his cousin had smoked the remainder of it. (Id. at 14:55). Trooper Peterson then asked whether there were any weapons in Linder's vehicle. (Id. at 14:55). Linder responded that there may be a few knives in the back of his car. Id. When asked, Linder denied that he had any drugs or paraphernalia on his person, but refused Trooper Peterson's request to search him.[4] (Id. at 14:55-56).

At Trooper Peterson's request, Linder got out of and walked to the front of the patrol car so that Trooper Peterson could search him. (Ex. 2 at 1:56). Once there, Trooper Peterson told Linder to place his hands behind his back and interlace his fingers. Id. Before doing so, Linder asked Trooper Peterson whether he was under arrest; Trooper Peterson responded that he was not. (T. 21). Linder then told Trooper Peterson that he had methamphetamine, took a plastic bag containing methamphetamine out of his left front pants pocket, and placed it on the hood of the

---

[3] At the suppression hearing, Trooper Peterson testified that Linder was not free to leave the patrol car during this period of questioning about the odor of burnt marijuana. (T. 33).

[4] Trooper Peterson told Linder that he could do so anyway, as he smelled burnt marijuana on Linder. (Id. at 14:56)

3

patrol car. (T. 22). Immediately after this, Trooper Peterson began handcuffing Linder. (T. 22). While being handcuffed, Linder told Trooper Peterson that he had more methamphetamine in the car.[5] (T. 23). Upon hearing this, Trooper Peterson searched Linder for drugs and then walked him toward the back of the patrol car. (Ex. 2 at 14:57). While placing Linder in the back seat of the patrol car, Trooper Peterson asked Linder if he was going to find anything else in the car, to which Linder responded "[y]eah, you are going to find some more dope, man." Id. Trooper Peterson next inquired whether the drugs would be green or white, to which Linder replied "White. It's in the center console." (Ex. 2 at 14:57).

Once Linder's two passengers were out of the vehicle, Trooper Peterson then searched Linder's vehicle, finding a marijuana pipe on the front passenger seat as well as a bag of methamphetamine in the center console. (T. 24-25). After completing the search, Trooper Peterson returned to the patrol car and read Linder the Miranda warnings. Linder then said, "I want an attorney, sir." (T. 26). Trooper Peterson did not ask Linder any further questions after this exchange. (T. 27).

Trooper Peterson transported Linder to the Hand County Sheriff's Office and then to the Beadle County Jail, where Linder was booked. (T. 27). While at the Beadle County Jail, Trooper Peterson performed another search on Linder, during which he found, in Linder's back pocket, a small metal baby spoon with white powder on it. (T. 27). Trooper Peterson also collected a urine sample from Linder, which tested positive for the presence of amphetamine and

---

[5] The Court has listened to Exhibit 2, the tape of the arrest. Although the audio quality is at times poor, the tape documents that Trooper Peterson, while handcuffing Linder, asked if Linder had any more drugs on him. Linder stated that he had more methamphetamine in the car. (Ex. 2 at 14:56:28).

cocaine.

A day or so later, Linder was released from custody on the state drug charges. On December 1, 2009, Linder was detained at the Lyman County Sheriff's office and was interviewed by four law enforcement officials, including Special Agent Dane Rasmussen of the South Dakota Division of Criminal Investigation ("DCI"). (T. 6). At the beginning of the interview, Rasmussen read Linder his Miranda rights. The interview was chiefly concerned with a string of burglaries taking place in Central South Dakota, but Linder's drug arrest was discussed as well. (T. 9). At one point during the interview, Rasmussen inquired whether either of Linder's passengers had been arrested on drug charges. (Ex. 1 at 21:00). Linder responded by explaining that the passengers were not arrested "because I am driving and I take the blame for my shit." (Id. at 21:00-22). Rasmussen then asked Linder whose methamphetamine was in the car, to which Linder replied "I ain't going to say that, I got a court date coming up, come on man, let's be for real here. I know you could be called to testify against me or anyone in here could be." (Id. at 22:00). Linder made known that he did not wish to speak further regarding ownership of the drugs.

Later in the interview, one of the law enforcement officials asked Linder what time it was when he was arrested for the drug offense. (Id. at 21:20; T. 11). Linder said that it was probably around two or three in the afternoon, and that "[t]he trooper said he smelled marijuana in the car, or whatever, you know, which gave him his probable cause. Nothing I could do about the smell in the car." (Ex. 1 at 21:20). Linder then said, "they caught me with stuff, you know, it's my stuff, it's my car, of course I am going to take the blame. If I did it, I did it. I am not going to let

5

my little brother go down on anything else."[6] (Id. at 27:30). Two minutes later, Linder said "I know you guys can't even ask me another question if I say I want an attorney." (Ex. 1 at 29:35). Rasmussen replied "[t]hat's your right," and then Linder said that "I ain't asking for an attorney here." (Id. at 29:40). The interview lasted approximately thirty-eight minutes.

Linder moved to suppress the evidence found on his person and in his car, as well as the results of his urine sample on the grounds that the searches leading to this evidence were unreasonable and in violation of his rights under the Fourth Amendment of the United States Constitution. (Doc. 15). Linder also moved to suppress the statements he made to Trooper Peterson during and in connection with the traffic stop. Finally, Linder moved to suppress the statements he made on December 1, 2009, during the interview with DCI Special Agent Dane Rasmussen.

## III. DISCUSSION

### A. Expansion of the Traffic Stop

Linder argues that Trooper Peterson violated the Fourth Amendment by expanding the investigation beyond the scope of the traffic stop without having a reasonable suspicion that a crime was being committed. It is well-established that an officer may conduct a reasonable investigation during a lawful traffic stop. See United States v. McCarty, No. 09-2977, 2010 WL 2836625, at *3 (8th Cir. July 21, 2010) (citing United States v. Ward, 484 F.3d 1059, 1061 (8th Cir. 2007)). "A reasonable investigation includes asking the driver for his license and registration, requesting the driver to sit in the patrol car to answer questions, verifying the

---

[6]One of the passengers in the car was Linder's first cousin, whom Linder occasionally called his brother.

driver's identification and related documents, and asking questions about the driver's itinerary." McCarty, 2010 WL 2836625 at *3. An officer may expand the scope of a traffic stop if "the responses of the detainee and the circumstances give rise to suspicions unrelated to the traffic offense." Ward, 484 F.3d at 1062 (internal citations omitted); see also United States v. Ramos, 42 F.3d 1160, 1163 (8th Cir. 1994). "To continue to detain a vehicle's occupants after the initial stop is completed, the officer must have been aware of particularized, objective facts which, taken together with rational inferences from those facts, reasonably warrant suspicion that a crime is being committed. Whether an officer has reasonable suspicion to expand the scope of a traffic stop is determined by looking at the totality of the circumstances, in light of the officer's experience." United States v. Shafer, 608 F.3d 1056, 1062 (8th Cir. 2010) (internal citations omitted).

Based upon certain objective facts taken as a whole, Trooper Peterson's expansion of the traffic stop was proper. First, Trooper Peterson testified that he had detected the odor of burnt marijuana emanating from Linder's person.[7] The Eighth Circuit has found the detection of the odor of marijuana on a person justifies the expansion of a traffic stop. See United States v. Binion, 570 F.3d 1034, 1039 (8th Cir. 2009) (finding officer was justified in expansion of traffic stop when she detected a strong odor of marijuana emanating from defendant's car and person, and defendant was lethargic, nervous, and shaky); United States v. Caves, 890 F.2d 87, 89-91 (8th Cir. 1989) (concluding odor of marijuana on breath and person provided probable cause for

---

[7] Linder objected to the Magistrate Judge's Report and Recommendation's factual finding that Trooper Peterson did not smell marijuana emanating from Linder's vehicle. Indeed, Trooper Peterson specifically testified that he did not smell burnt marijuana coming from Linder's vehicle, but did smell it emanating from Linder himself. (T. 30).

7

police to search vehicle without warrant). Second, Linder gave inconsistent answers to questions concerning why he smelled like burnt marijuana, twice denying marijuana use within the car and then admitting that his cousin had actually been smoking marijuana in the vehicle. (Ex. 2 at 14:55). The Eighth Circuit has found similar conduct to give rise to reasonable suspicion to expand a traffic stop. United States v. Bracamontes, No. 09-3897, 2010 Westlaw 3034676 (8th Cir. Aug. 5, 2010) (finding reasonable suspicion to expand traffic stop when occupants of vehicle contradicted one another in their statements to police); see also United States v. Griffin, 109 F.3d 706, 708 (11th Cir. 1997) (finding that odor of marijuana coming from vehicle and inconsistent statements from occupants regarding their destination amounted to a reasonable suspicion that defendants were engaged in criminal activity). Accordingly, Trooper Peterson's suspicion was reasonably warranted in light of the totality of the circumstances, and he was justified in expanding the traffic stop.

**B. Probable Cause to search Linder and his Vehicle**

Linder also argues that even if there was a reasonable suspicion that justified expanding the scope of the traffic stop, there was insufficient evidence to give rise to probable cause to search Linder's person or his vehicle without a warrant. Probable cause to search exists "where the known facts and circumstances are sufficient to warrant a man of reasonable prudence in the belief that contraband or evidence will be found." Ornelas v. United States, 517 U.S. 690, 696 (1996). "[T]he substance of all the definitions of probable cause is a reasonable ground for belief of guilt, and that the belief of guilt must be particularized with respect to the person to be searched or seized." Maryland v. Pringle, 540 U.S. 366, 370-71 (2003) (internal citations omitted). When determining whether probable cause to search exists, the court looks at the

8

"totality of the circumstances." Brown, 550 F.3d at 727.

The Eighth Circuit has considered a case somewhat similar to this case. In Caves, the Eighth Circuit noted:

> [a]lthough the odor of burnt marijuana on the driver alone is undoubtedly less probative of the existence of unused marijuana in the automobile than would be the odor of unburnt marijuana emanating from both the driver and the vehicle, we are unable to conclude that the odor of burnt marijuana on [the defendant's] breath and person, when considered in the context of the circumstances confronting the trooper, was insufficient to establish probable cause for the search of the automobile.

Caves, 890 F.2d at 91. Linder argues that Caves is distinguishable from his case, as it concerned the issue of the probable cause necessary to search an automobile, rather than the driver. However, the existence of probable cause to search Linder's vehicle under the circumstances justified a search of his person. To search either a vehicle or a person, the quantum of facts required for the officer to search is "probable cause."

Many of the same facts justifying the expansion of the traffic stop also provided probable cause to search Linder. Trooper Peterson detected the odor of burnt marijuana emanating from Linder, which in itself, is a factor weighing heavily in favor of finding probable cause. Caves, 890 F.2d at 90 ("The Supreme Court has recognized that the odor of an illegal drug can be highly probative in establishing probable cause for a search.") (citing Johnson v. United States, 333 U.S. 10, 13 (1948)). Linder also was inconsistent in asserting that no one had smoked marijuana in his vehicle and then admitting that at least one person had been using drugs in his vehicle. Under the circumstances, Trooper Peterson had a reasonable ground to believe that Linder possessed or had used marijuana. See United States v. Humphries, 372 F.3d 653, 658 (4th Cir. 2004) ("We

9

have repeatedly held that the odor of marijuana alone can provide probable cause to believe that marijuana is present in a particular place."). Indeed, before Trooper Peterson began to search him, Linder pulled a bag of methamphetamine out of his pants pocket and placed it on the hood of the patrol car.[8]

The circumstances justifying the search of Linder's person established probable cause to search Linder's vehicle. The factors just mentioned, including and especially the methamphetamine Linder pulled out of his pants pocket and his statement "there may be a few knives in the back seat," were sufficient to establish the probable cause needed to search the vehicle under the "automobile exception." See Caves, 890 F.2d at 91; United States v. Davis, 569 F.3d 813, 817 (8th Cir. 2009) (finding that an officer had probable cause under the "automobile exception" to search vehicle after discovering a bag of marijuana in the driver's pocket).

Trooper Peterson's search of Linder's vehicle also is justified as a "search incident to arrest." The search of Linder's car took place after his arrest and following the discovery of methamphetamine on his person. "When a vehicle's occupant has been lawfully arrested, the vehicle may be searched without a warrant incident to the arrest, "'when it is reasonable to believe evidence relevant to the crime of arrest might be found in the vehicle.'" United States v. Winters, 600 F.3d 963, 968 (8th Cir. 2010) (citing Arizona v. Gant, 129 S. Ct. 1710, 1719 (2009)). Given the fact that Linder had made inconsistent statements to Trooper Peterson concerning drug use in the car and had methamphetamine on his person, Trooper Peterson had

---

[8] This Court need not address Linder's argument that these actions were only in response to an illegal anticipatory search, because the search was not illegal.

reason to believe that there could be more drugs in Linder's vehicle. Thus, the search of the vehicle was constitutionally reasonable both because the totality of the circumstances provided probable cause to search and because there was reason to believe that evidence of the crime for which Linder was arrested might be found in the vehicle.

**C. Suppression of Linder's statements made to Trooper Peterson during traffic stop**

Linder moved to suppress, as a violation of Miranda, the statements he made after Trooper Peterson told Linder he was going to search him.[9] The Fifth Amendment to the United States Constitution states that a defendant cannot be "compelled in any criminal case to be a witness against himself." The Supreme Court in Miranda v. Arizona, 384 U.S. 436, 478-79 (1966), held that a suspect under custodial interrogation must be given notice of his Fifth Amendment right against self-incrimination. "Custodial interrogation" means "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." Yarborough v. Alvarado, 541 U.S. 652, 661 (2004) (citing Miranda, 384 U.S. at 444). Any response to a custodial interrogation that lacks the procedural safeguards required by Miranda will be excluded from being used as substantive evidence. Miranda, 384 U.S. at 475. Such statements, however, may be admitted for impeachment purposes if the defendant testifies at his trial, so long as the statements were voluntary. See Harris v. New York, 401 U.S. 222, 226 (1971); United States v. Havens, 446 U.S. 620, 627 (1980).

Linder was in custody when he said that there was more methamphetamine in the car.

---

[9] Linder also argued that his statements should be suppressed because they were the product of an anticipated illegal search. However, as explained previously in this Opinion and Order, no illegal search occurred.

When Linder made that statement, Trooper Peterson had begun handcuffing him, thus depriving him of his freedom of action in a significant way. Linder's statement was in response to a question from Trooper Peterson that was reasonably likely to elicit an incriminating response from Linder. (T. 22-23). Under Rhode Island v. Innis, 446 U.S. 291 (1980), an interrogation is subject to Miranda if the defendant is in custody and if the police should know their words or actions are "reasonably likely to elicit an incriminating response," which is any inculpatory or exculpatory response that the government may seek to introduce at trial. Id. at 301. The definition of a custodial interrogation includes explicit questioning initiated by police. Id. at 300-01 (finding that interrogation occurs when a law enforcement officer engages in "either express questioning or its functional equivalent"). Here, Trooper Peterson, while handcuffing Linder, asked Linder a question concerning whether he had any more drugs on him. Such a question regarding the existence of other evidence of wrongdoing was reasonably likely to illicit an incriminating response. Thus, Linder's statement regarding the existence of more methamphetamine within the car will be suppressed under Miranda. However, that statement may be admitted for impeachment purposes if Linder testifies at his trial, because Linder voluntarily made the statement. See Harris, 401 U.S. at 226 (1971); Havens, 446 U.S. at 627 (1980).

Similarly, Linder's statements to Trooper Peterson made while Linder was handcuffed and in the back of the patrol car will be suppressed because they were made in response to questions directed at Linder while he was in custody and not Mirandized. After Trooper Peterson had handcuffed, searched, and placed Linder in the back of the patrol car, he asked Linder whether he would find anything else in the car to which Linder responded in the affirmative.

12

Trooper Peterson then asked Linder whether the drugs would be green or white, and Linder told him they would be white and were in the center console of the vehicle. Trooper Peterson had not yet read Linder his Miranda rights at that point. Accordingly, those statements also will be suppressed under Miranda. These statements, however, are admissible for impeachment purposes if Linder chooses to testify. See Harris, 401 U.S. at 222.

**D. Suppression of Linder's statements to Agent Rasmussen on December 1, 2009**

Linder moves to suppress the statements he made to Agent Rasmussen and three other law enforcement officers who interviewed him on December 1, 2009. On November 28, 2009, Linder invoked his right to counsel when, after being read his Miranda rights, he told Trooper Peterson that he wanted an attorney. Linder's right to counsel had not been voluntarily and properly waived on December 1, prior to additional questioning by law enforcement while detained. Therefore, the statements made during this custodial interrogation must be suppressed.

In Edwards v. Arizona, the Supreme Court held that "when an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he had been advised of his rights." 451 U.S. 477, 484 (1981). If a suspect does invoke his right to counsel during custodial interrogation, a presumption arises that any subsequent waiver is involuntary. Arizona v. Roberson, 486 U.S. 675, 681 (1988) ("[I]f a suspect believes that he is not capable of undergoing such questioning without the advice of counsel, then it is presumed that any subsequent waiver that has come at the authorities behest, and not at the suspect's own instigation, is itself the product of 'inherently compelling pressures' and not the purely voluntary choice of the suspect.").

In Maryland v. Shatzer, the Supreme Court considered whether a break in custody ends the presumption of involuntariness established in Edwards. 130 S. Ct. 1213, 1217 (2010). After considering the costs and benefits of the Edwards rule, the Supreme Court determined that the Edwards presumption must be deemed to have an ending point after "the termination of Miranda custody and any of its lingering effects." Id. at 1222. The Supreme Court concluded that a break in custody sufficient to eliminate the Edwards presumption is 14 days. Id. at 1223 ("It seems to us that period is 14 days. That provides plenty of time for the suspect to get reacclimated to his normal life, to consult with friends and counsel, and to shake off any residual coercive effects of his prior custody."). In explaining how the new bright-line rule would work, the Supreme Court stated:

> In every case involving Edwards, the courts must determine whether the suspect was in custody when he requested counsel and when he later made the statements he seeks to suppress. Now, in cases where there is an alleged break in custody, they simply have to repeat the inquiry for the time between the initial invocation and the reinterrogation. In most cases, that determination will be easy. And when it is determined that the defendant pleading Edwards has been out of custody for two weeks before the contested interrogation, the court is spared the fact-intensive inquiry into whether he ever, anywhere, asserted his Miranda right to counsel."

Id. at 1223-24.

Under Shatzer, Linder's statements on December 1, 2009, concerning the incident three days earlier on November 28 must be suppressed. When Linder originally requested an attorney on November 28, he was in custody, as he was handcuffed and seated in the back of the patrol car after having provided Trooper Peterson with methamphetamine. When the police

interviewed Linder three days later, he was once again in custody.[10] Agent Rasmussen and the other law enforcement officers initiated the custodial interrogation and the discussion of the events taking place on November 28. The three day time span between Linder's initial request for an attorney and the later custodial interrogation falls short of the 14-day period established in Shatzer.

The Government has failed to show[11] that Linder on December 1 waived his rights to counsel being present during a custodial interrogation in a knowing, voluntary, and intelligent way under the "high standard of proof for the waiver of constitutional rights." Id. at 1219. Accordingly, Linder's statements on December 1 concerning the incident taking place on November 28 were involuntary and obtained in violation of the Fifth Amendment and must be suppressed both as substantive evidence, based on Shatzer and Edwards, and for impeachment purposes under Mincey v. Arizona, 437 U.S. 385, 397-98 (1978) ("Statements made by a defendant in circumstances violating the strictures of Miranda v. Arizona are admissible for impeachment if their 'trustworthiness . . . satisfied legal standards.' But any criminal trial use against a defendant of his involuntary statement is a denial of due process of law, 'even though there is ample evidence aside from the confession to support the conviction.'") (citations omitted).

**E. Suppression of Linder's urine sample taken at the Beadle County Jail**

Linder asserts that the urine sample Trooper Peterson obtained from him violated the

---

[10] When asked whether Linder was in custody on December 1, 2009, Agent Rasmussen replied that "[h]e was detained at the time."

[11] The Government filed no objections to the Report and Recommendation.

Fourth Amendment because Linder did not voluntarily give the sample and Trooper Peterson had no probable cause to order him to do so. Compelled urinalysis is considered a search under the Fourth Amendment. See Skinner v. Railway Labor Executives' Ass'n, 489 U.S. 602, 617 (1989). Probable cause sufficient for a warrantless search exists where the known facts and circumstances are sufficient to give a person of reasonable prudence the belief that contraband or evidence of a crime will be found. Ornelas, 517 U.S. 690, 696 (1996).

Here, a person of reasonable prudence, knowing what Trooper Peterson did at the time, would believe that evidence of a crime could be discovered through a urinalysis of Linder. See United States v. Twiss, 127 F.3d, 771, 773-74 (8th Cir. 1997) (finding that police had probable cause to compel urinalysis based upon the totality of the circumstances). Indeed, Linder smelled of burnt marijuana and provided methamphetamine from his pocket to Trooper Peterson. Trooper Peterson and law enforcement personnel at the jail had probable cause to obtain a urine sample from Linder before evidence of drug use and his possession of one or more illegal substances dissipated.

## IV. CONCLUSION AND ORDER

For the reasons explained herein, it is

ORDERED that Plaintiff's Motion to Suppress (Doc. 14) is granted in part and denied in part. It is further

ORDERED that Defendant's objections to the Report and Recommendation are overruled. It is further

ORDERED that the Report and Recommendation of Magistrate Judge Mark Moreno (Doc. 21) is adopted.

Dated September 2, 2010.

        BY THE COURT:

        /s/ *Roberto A. Lange*
        ROBERTO A. LANGE
        UNITED STATES DISTRICT JUDGE